DIXON, Justice.
We granted writs upon the mistaken representation of the plaintiffs that there was a relationship between defendant, American Express Company, and the American Express Company, S.A.I. (an Italian corporation) which might cast American Express Company for acts committed by employees of American Express Company, S. A.I., and to review the opinion of the Court of Appeal, 274 So.2d 857.
Plaintiffs are husband and wife. Mrs. Olga Levy (a former airlines stewardess) made a trip to Europe and suffered an injury to her leg. The suit arises as a result of embarrassment and discomfort suf'fered by Mrs. Levy on her return trip. In addition to American Express Company, defendants are Trans World Airlines, Inc. and Delta Air Lines, Inc.
Through McDougall’s Travel Agency of New Orleans, Mrs. Levy purchased a round trip ticket at excursion rates to Italy in March of 1969. One of her objects was to visit her brother, Dr. Philip G. Weiler, a physician in the United States Navy in Italy. While in Italy, Dr. Weiler arranged for a trip for himself and his sister to Greece and Yugoslavia for sightseeing and skiing. It was while in Yugoslavia that Mrs. Levy suffered a skiing accident *786 which resulted in a fracture of the tibia of her left leg.
In Yugoslavia the leg was placed in a cast and Mrs. Levy was driven back to Naples by her brother. There she was hospitalized in a United States Naval facility; her leg was ultimately placed in a long leg cast.
Dr. Weiler undertook to make arrangements for his sister’s return to the United States. From several alternatives, a decision was made that Mrs. Levy would return, unattended, on a regular commercial flight.
The evidence concerning the arrangements for Mrs. Levy’s return flight is conflicting in many respects, and rather vague in others. Dr. Weiler testified that he went to the Naples olfice of American Express Company, S.A.I. and consulted a travel representative. He testified that he informed the travel agent that his sister was in a long leg cast and could not walk and would requre . special attention. Among the requirements were “some type of toilet facilities . . . such as a bedpan or an attendant to carry her to the bathroom” and a wheel chair at the airports with attendants.
Dr. Weiler exchanged Mrs. Levy’s excursion ticket, plus $337.50, for first class tickets. The time for the excursion rate had passed. He was given a first class ticket for one seat on TWA from Rome to New York, and one first class ticket on Eastern Airlines from New York, to New Orleans. Mrs. Levy was transported by Naval ambulance from Naples to the airport at Rome. Although she was listed on the passenger list, with a notation that there was a cast on her leg, Mrs. Levy was not expected by TWA employees. Nevertheless, a representative of TWA obtained a wheel chair and assisted Mrs Levy and her brother in going through customs and obtaining a seat on the airplane.
What followed is probably a result of confusion among the people interested in getting Mrs. Levy back to the United States. Dr. Weiler, assisted by employees of TWA, used a wheel chair to get Mrs. Levy to the door of the airplane. Then it was necessary to lift her out of the wheel chair and place her in a seat. The first seat proved to be unsatisfactory and, while being moved to another seat, Mrs. Levy requested that she be carried to the toilet. Her brother and two other male employees of TWA carried her to the toilet and seated her upon it. Her leg, which extended out the toilet door because of the long leg cast, was held by her brother. She was returned to her seat and the back of the seat in front of her was lowered. Her leg was propped on pillows. Dr. Weiler testified that he was at that time sure, from assurances made to him, that if it were not possible for his sister to be carried to the toilet during the flight, a bedpan would be furnished her. TWA employees testified that there was no bedpan on the plane and no request for one; that they repeatedly pointed out to Dr. Weiler and Mrs Levy their doubts about her ability to make the trip without great discomfort, but their doubts were allayed by assurances from Dr. Weiler. Mrs. Levy testified that as soon as she boarded the airplane she asked the stewardess if there was a bedpan on board and the stewardess replied that there was none. The TWA employees testified that they planned to furnish diapers on board, but they did not have enough; that they sent to the commissary and obtained an additional quantity of diapers in case they were needed during the trip. None of the witnesses indicated that there was any assurance that Mrs. Levy could have been carried to the toilet while the plane was in flight. Having made his sister comfortable, and satisfied with the arrangements, Dr. Weiler left the plane and departed from the airport long before the plane took off for New York.
*787 The flight from Rome to New York took about eight hours. When the inevitable urge of nature was felt by Mrs. Levy, the stewardness removed the other passengers from the compartment, surrounded Mrs. Levy with a screen of blankets, and furnished diapers to absorb the urine.
There is no evidence that any of the assistance provided Mrs. Levy, from boarding the plane until the termination of the flight to New York, was performed with anything less than propriety, dignity and courtesy, under the circumstances. Mrs. Levy did not complain of embarrassment at the time, and seemed to accept that what was done was necessary. One complaint now made by Mrs. Levy was that, since the wheel chair was too wide to go down the aisle in the airplane, she was embarrassed when her skirt flew up as she was being carried from the wheel chair to her seat. Her testimony at the deposition taken prior to trial indicates no embarrassment whatsoever.
The other embarrassing situation of which Mrs. Levy complains was the absence of a bedpan on the flight. Mrs. Levy herself testified that she knew there was no bedpan on the flight, when she first boarded the plane. She boarded the plane well in advance of departure time. The record indicates that she acquiesced in the planned use of diapers prior to departure. Why the use of the bedpan would be less embarrassing than the use of diapers is unexplained. The bedpan may be more conventional for adults, but Mrs. Levy knew that there was no bedpan long prior to departure from the airport.
During the flight from Rome to New York, it became apparent that the TWA plane would not make connections with the Eastern flight from New York to New Orleans, on which Mrs. Levy was ticketed. TWA personnel communicated with people in New York, and Mrs. Levy’s ticket was changed from the Eastern flight to a Delta flight from New York to New Orleans.
Upon arrival at New York, there was no one on hand to meet Mrs. Levy with a wheel chair. After other passengers disembarked from the plane, a flight attendant obtained a wheel chair and some ground personnel who removed Mrs. Levy from the plane and took her to the Delta waiting room. About this stage, Mrs. Levy makes the complaint that she was not furnished accommodations in the “V.I.P.” lounge, as she was told she woúld be. She was denied access to a “V.I.P.” lounge because, she was informed, she had no reservation for such accommodations.
TWA was under no obligation to furnish such special accommodations to Mrs. Levy. She was provided with, at least, the same accommodations other first class passengers received, in addition to attendants. who moved her in a wheel chair and saw to her needs. They assisted her in the use of the toilet facilities at the airport in New York.
Mrs. Levy’s complaint against Delta is made because, she says, she was forced to “void upon herself” on the trip from New York to New Orleans — a two hour flight. Mrs. Lev^ did not testify to any request to Delta for any special accommodations whatsoever. When, on the flight, plaintiff informed the stew*ardess that she needed to urinate, the stewardess informed Mrs. Levy that it was not possible to get her in the bathroom during the flight. There is no evidence that Delta knew in advance of her incapacitated condition. There is no évidence that a bedpan was requested from Delta, either at the airport or on the flight. Delta cannot be charged with responsibility for Mrs. Levy’s discomfort and embarrassment on that flight.
There is a complete failure of proof that TWA or Delta violated any contractual or delictual obligation to Mrs. Levy.
The only evidence in tjie record to connect defendant American Express Company with the incident is that American Express Company travelers checks were used *788 by Dr. Weiler to pay the additional expenses for first class passage from Rome to New Orleans. The defendant American Express Company and its employees had nothing to do with the arrangements for the trip.
The only evidence in the record concerning the connection between the defendant American Express Company and American Express Company, S.A.I. is an affidavit placed in the record on a motion for summary judgment. That affidavit relates that the American Express International Banking Corporation is “a subsidiary company” of the defendant American Express Company, and that American Express Company, S.A.I. is a “subsidiary company” of American Express International Banking Corporation, and is an Italian corporation not doing business outside of Italy. There is no evidence that American Express Company, S.A.I. or any of its employees with whom Dr. Weiler dealt were in any other way connected with the defendant American Express Company. There is no evidence that, in this transaction, the American Express Company, S. A.I. was performing any act for,or on behalf of the defendant American Express Company.
Plaintiffs urge that we, somehow, because of other reported cases, take “judicial notice” that the American Express Company, S.A.I., a subsidiary of a subsidiary of defendant American Express Company, is an agent of the defendant. This we cannot do. As long as corporate status prevails, each corporation is treated as an individual person, with certain exceptions not here applicable. Nothing in this record would justify imposition of liability upon the defendant American Express Company for misdeeds of employees of a subsidiary of a subsidiary of the defendant.
Nor is there sufficient evidence in this record for us to hold that representations or agreements made by an employee of American Express Company, S.A.I. in the sale of a TWA ticket to Dr. Weiler could result in liability on the part of TWA for the failure to furnish “some type of toilet facilities . . . such as a bedpan or an attendant to carry her to the bathroom” and prompt attendants with wheel chairs at the airports. These were the “requirements” Dr. Weiler testified he made with the representative of American Express Company, S.A.I. Dr. Weiler knew that he received only two first class airplane tickets. Mrs. Levy knew exactly what to expect on the TWA plane before its departure.
Plaintiffs’ counsel complains of a ruling of the trial judge which denied him the right to cross-examine an employee of one of the defendants, Mrs. Keating, who was present in court.
 Near the end of the trial, when plaintiffs’ counsel learned that a defendant would not call an employee to the witness stand, he announced that he would call her on cross-examination. The judge refused to allow her to be cabed by the plaintiffs stating that “she has not been subpoenaed by you. You have no right to call her under cross-examination.” Although we can understand the exasperation of the trial judge at the conclusion of this trial, his ruling was clearly erroneous. C.C.P. 1634. However, upon the court’s ruling, the plaintiffs’ counsel announced, “ . we waiver our right to call Mrs. Keating.” Plaintiffs’ counsel does not mention this “waiver” to us in brief, nor does he make any showing that the witness could have assisted his case in any way.
For these reasons, the judgment of the Court of Appeal is affirmed, at plaintiffs’ costs.