NORRIS, Judge.
The plaintiff, Ed C. Harper, sued the Estate of J.B. Wells for the balance allegedly due on an agreement they entered before Wells’s death in May 1988. Harper alleged that Wells contracted with him to restore a 1929 Ford Model A Tudor; that he performed the work; and that after credit for payments already made, the estate owed him $13,582.18 for parts and labor. Harper also sought a writ of sequestration which was granted and dissolved before trial. The estate reconvened, *896 seeking unpaid legal fees of $2,541.67. The matter went to trial in April 1989; by judgment of January 1990 the court awarded Harper $11,610. The estate appeals sus-pensively, raising two assignments:
(1) The trial court erred in granting judgment in favor of the plaintiff who presented no witness other than himself and therefore did not meet the burden of proof of the “Dead Man Statute,” La. R.S. 13:3722; and
(2) Alternatively, if the plaintiff met his burden, then the trial court erred in awarding excessive damages for his claim.
We conclude that although there was adequate evidence to prove a contract between Harper and the late Mr. Wells, the trial court was plainly wrong in finding sufficient evidence of the amount of the “debt or liability” under the Dead Man Statute. Harper is entitled to reimbursement for parts and reasonable compensation for his labor. Because this total is offset by payments already received and unpaid legal fees owed to Wells, the trial court’s judgment will be reversed and judgment rendered dismissing the parties’ respective demands.

Facts

At trial Harper called only one witness, himself. He testified that he had retained Wells for a domestic matter in 1982 and, subsequently, for other legal matters. In the course of their discussions he mentioned that he restored old cars at his house. In September 1986 Wells told Harper he had a 1929 Ford Model A and asked if Harper could restore it. Harper inspected the car and initially refused the project. He explained that the car was in such poor condition that it was “not worth fixing”; replacement parts alone could run $9,000 to $10,000, more than the finished product would be worth. However, Wells told him, “Go ahead and fix it.” Wells wanted not an authentic antique (all original parts) but a running car that would be good looking and street legal with modern modifications such as signal lights.
Harper testified that Wells agreed to pay $15 an hour for Harper’s labor and did not set a maximum number of hours or a completion date. There was no written contract and no one else was present when Harper and Wells reached their agreement.
Harper gathered parts for several months before he began the actual work in February 1987. He testified that he kept a summary of daily labor and monthly parts. These details are summarized in Exhibit P-1; the actual monthly parts invoices are included in Exhibit P-2 in globo. The invoices showed a parts total of $8,332.13 and a labor total of $16,200, for a grand total of $24,532.13, which he claimed. Harper testified that he forwarded his summaries to Wells every three months and that Wells would pay him soon thereafter, either in cash or by credit against Harper’s debt to Wells for legal services. Wells’s secretary, Ms. Storms, was present on several occasions when Wells paid. Wells would check on Harper’s progress every two or three weeks and seemed very pleased with the work. Harper further testified that Wells’s periodic payments did not, and were not intended to, get his account current; as a retired man Harper did not need all his money at once. Wells’s payments and credits eventually totalled $11,000.
Wells’s last payment, of $1,000 cash, was on March 29, 1988. Harper testified this occurred “at the lot” and Ms. Storms was not present. Harper denied that Wells said he owed no more money or wanted to audit Harper’s records. He also denied that the $1,000 payment made them “even” as of that date. He admitted, however, that Wells wanted to make sure the summaries were correct. Harper apparently knew that Wells was becoming concerned about the cost; at one point (Harper was not specific when) Wells remarked, “That’s going to cost a lot of money, isn’t it?” According to Harper, Ms. Storms was present and replied, “You knew that.”
Whatever his concerns, Wells never told Harper to stop working. Harper knew that Wells was planning a vacation in Colorado for late May 1988 and wanted to have *897 the Model A by then. Harper poured a lot of hours into the project that month in an effort to get the car ready for Wells’s vacation. Exhibit P-2 shows that Harper billed 114½ hours in May, about half again as much as the average month; he also listed 250V2 “grattis [sic ] hours,” which he nevertheless claimed against the estate. Despite his efforts, by May 18 when Wells met with Harper for the last time, he was “in agreement” that the car was not quite ready.
J.B. Wells died on vacation on May 30, 1988. Harper testified that he substantially completed the car and submitted the bill to Wells’s son, who did not pay. On cross examination Harper admitted that he still owed Wells $1,922.22 for professional services.
The estate called Ms. Storms before Harper had rested his case. She testified she was present for about half of Wells and Harper’s conversation of March 29, 1988. She described Wells as “frustrated” though not “accusatory” about the cost, having earlier expressed an intent to double-check Harper’s records. Wells gave Harper a large sum of cash and asked, “Is this all I owe you as of right now?” Harper replied, “Yes.” Ms. Storms felt sure Wells was paid up as of that date. Harper returned part of the cash to Wells to pay for legal fees and Ms. Storms wrote him a receipt. Despite his concern over the cost Wells seemed happy with Harper’s work and never told him to quit. In late April or early May, in fact, Wells told Ms. Storm and others that the car was “ready to be looked at.” He obviously thought it was finished.
The estate also called Mr. Harold Polk, whom the court accepted as an expert in auto mechanics and the restoration of vehicles. He testified that a restored car has no antique value unless it is restored to its original state. He inspected Wells’s Model A and found that though it was excellently rebuilt it was not “authentic.” If it were authentic it would be worth $6,000 to $6,500; as a repaired car it was worth about $3,000. Although he had not seen the car before Harper began work, he felt he could have restored it for less than the $11,000 that Wells had already paid. He estimated the job should have taken no more than a month. On cross examination he agreed that restoration work is tedious and $15 an hour is reasonable. He also admitted that antique cars are hard to value and may be the objects of sentimental attachment, but he did not think a car could be worth any more than its antique value.

Action of the trial court

By written opinion the court found that Wells asked Harper to “repair and refurbish” his Model A without limitation as to time or cost. The court further found that Ms. Storms was a credible witness whose testimony corroborated the “gist” of Harper’s claim even though she did not know the exact amount owed or paid; her testimony was sufficient under Landry v. Weber, 345 So.2d 11 (La.1977). Accepting Harper’s bills as accurate, the court awarded him a total of $24,532.13 ($16,200 for labor and $8,332.13 for parts), subject to a credit for $11,000 already paid and an offset of $1,922 for unpaid legal fees owed to Wells. Harper’s net award was $11,610.

Discussion

When a claimant seeks to recover a debt from a dead person’s estate, he must meet the procedural and evidentiary standards of the Dead Man Statute, La.R.S. 13:3721-3722. In order to introduce parol evidence of the debt or liability, the claimant may file suit against the succession representative, heirs or legatees within one year of the death of the deceased. R.S. 13:3721(1). Harper complied with this. R.S. 13:3722 provides:
§ 3722. Same; evidence required when parol evidence admissible
When parol evidence is admissible under the provisions of R.S. 13:3721 the debt or liability of the deceased must be proved by the testimony of at least one creditable witness other than the claimant, and other corroborating circumstances.
The purpose of requiring a creditable witness is to eliminate the possibility of *898 fraud and perjury by witnesses who have a direct pecuniary or proprietary interest in the claim. Savoie v. Estate of Rogers, 410 So.2d 683 (La.1981).
By its first assignment the estate urges Harper failed to meet the burden of proof of § 3722 because he presented no witness other than himself; Ms. Storms, whom the court took as creditable, was actually the estate’s witness. In support it cites Porter v. Johnson, 408 So.2d 961 (La.App. 2d Cir.1981), writ denied 412 So.2d 99 (1982), in which this court stated that the plaintiff lost, among other reasons, because he “failed to offer the testimony of any witness other than himself[.]”
The estate’s argument, strictly construed, is not persuasive. True, the plaintiff has the burden of proving his claim. Cases are legion in which the entire appellate record consisted of the claimant’s testimony, unsupported by creditable testimony, and his bill, unacknowledged by the estate. Such claimants invariably lose because they did not meet the burden of proof. See, e.g., Bourque v. Schroeder, 418 So.2d 25 (La.App. 3d Cir.), writ denied 422 So.2d 165 (1982); Succession of Flach, 437 So.2d 379 (La.App. 4th Cir.1979); B. Stern Co. v. Perry, 246 So.2d 246 (La.App. 1st Cir.), writ denied 258 La. 763, 247 So.2d 863 (1971). Here, however, the record did not consist entirely of the claimant’s testimony and bills; it included the claimant’s cross examination of Ms. Storms, whom he could have called as an adverse witness. La.C.Ev. art. 611B; Levy v. American Express, 287 So.2d 784 (La.1973); Nevils v. Singer Co., 533 So.2d 157 (La.App. 5th Cir.1988). The plaintiff, in fact, did not rest his case until after Ms. Storms testified. The trial court was entitled to regard her testimony as part of the plaintiff’s case, and Harper did not fail to offer the testimony of another witness than himself; his claim is not defeated on this basis.
The estate further argues, however, that Ms. Storms’s testimony does not really prove the “debt or liability.” The trial court relied on Landry v. Weber, supra, to hold that the creditable witness need not verify the exact amount of the debt. Landry actually holds that the creditable witness need not corroborate every detail of the agreement; the creditable testimony, together with objective corroborating evidence, proved in that case a very precise estimate of the debt. The claimant, Landry, alleged that the decedent, Mrs. Villere, hired him to repair and sell a dragline that had belonged to her late husband. Landry’s chauffeur, Butler, was present when the agreement was struck; he testified to it. Later, Butler was present when Landry and Mrs. Villere agreed that Landry would receive a 10% commission for his work. Landry eventually sold the dragline for $15,000; Butler saw the buyer haul it away. Mrs. Villere indorsed the purchaser’s draft and reimbursed Landry for repair costs; according to Landry (but not witnessed by Butler) she promised to send him the $1,500 commission. She died before he received it. The Supreme Court held that despite some inconsistencies in his recollection of time and place, Butler was “utterly clear and honest” as to the agreement and commission. Documentary evidence such as Mrs. Villere’s bank deposit statement and her check for repairs verified that Landry sold the dragline for $15,-000. The quantum was a simple matter of figuring 10% of the sale price.
In the instant case the corroborative value of Mrs. Storms’s testimony falls far short of that in Landry v. Weber. She testified that Harper was restoring the car for Wells, who made occasional payments; the agreement itself is verified objectively by the completed car, shown in photos as Exhibits D-5 through D-15. She offered no testimony whatsoever about the price or method of calculating the price, and certainly did not verify that Harper had carte blanche in completing the project. In the most important respects, she actually contradicted Harper’s claim. She positively asserted that Wells was paid up as of March 29, 1988. This is not a matter of weighing conflicting testimony and accepting one version over another; this is the absence of a threshold element of proof under § 3722. Ms. Storms also testified that Wells thought the car was ready in *899 late April or early May. This obviously cannot serve to corroborate Harper’s claim for a total of 1141/2 hours (or perhaps more, if gratis hours are counted) in May. Ms. Storms’s testimony was antithetical to Harper’s claim for further payment and cannot be accepted, even under Landry v. Weber, as creditable to prove the extent of the debt or liability.
The trial court was not wrong to use Ms. Storms’s testimony to prove an agreement to repair or restore the car. However, a claimant may prove an agreement and fail to prove, under the Dead Man Statute, the amount.of the debt or liability. Savoie v. Estate of Rogers, supra; see also Hebert v. Estate of Savoie, 499 So.2d 642 (La.App. 3d Cir.1986); Financial Corp. v. Estate of Cooley, 447 So.2d 594 (La.App. 3d Cir.1984). Under the circumstances the trial court was plainly wrong to use Ms. Storms’s testimony as creditable to prove the amount of the debt or liability.
By its second assignment the estate urges the trial court was plainly wrong in assessing the value of Harper’s claim; the $11,000 already paid exceeds the reasonable value of the work. In general, when a claimant fails to prove the price, he is entitled to be paid under the principles of quantum meruit. La.C.C. art. 2055; Skains v. White, 391 So.2d 1327 (La.App. 2d Cir.1980); Sizeler v. Muller, 467 So.2d 1268 (La.App. 4th Cir.), writ denied 469 So.2d 990 (1985). In Peltier v. Thibodaux, 175 La. 1026, 144 So. 903 (1932), the claimant was an attorney who represented the deceased over a period of several years prior to the latter’s death. The claimant sued under the Dead Man Statute seeking $7,500 in unpaid professional fees. The deceased’s son, a creditable witness, verified that Mr. Peltier had rendered unre-munerated legal services to his father but did not know how much these were worth. The trial court awarded the claimant $3,640 as a fair value of his services and the Supreme Court affirmed. In the instant case, Harper is likewise entitled to a fair value for his services.
Mr. Polk testified that as a repaired car, this Model A was worth about $3,000; as an antique it was worth $6,000 to $6,500. On cross examination, Harper admitted a 1929 Model A could be worth from $7,000 to $12,000. Mr. Polk could not dispute Harper’s claim that all the invoiced parts, totalling $8,332.13, had been incorporated into the car. Harper’s claim that he spent 1,080 hours on the car was contradicted both by Ms. Storms, who testified the car was ready in late April or early May, and by Mr. Polk, who said the labor required for this restoration project should have taken no more than a month. Mr. Polk also testified that $15 an hour was reasonable.
Harper contends in brief that he can recover more than the value of the finished product because the car gratified a nonpe-cuniary interest of Wells’s. La.C.C. art. 1998. There is no record evidence to support the claim that this restoration project was a “contract involving matters of sentimental value.” C.C. art. 1998, Official Revision Comment (c). This claim lacks merit.
We have considered whether simply to deduct from Harper’s claim the hours logged after May 1, 1988, when the car was supposedly finished, and the gratis hours. This would leave a claim for 715 hours, or a labor cost of $10,725.00. Adding the parts, this would yield a total cost of $19,057.13, which is much higher than Harper’s highest estimate of the car's value and clearly excessive.
Under the circumstances we accept the expert’s testimony that a project of this type should normally take no more than a month. Using the hourly rate of $15, and 40 hours a week, 4.3 weeks per month (see La.R.S. 23:1221(3)(a)), this yields a labor cost of at least $2,580.00. Adding the parts, the total cost is $10,912.13, or in the midrange of Harper’s own estimates of what the finished product would be worth. Harper was entitled to collect at least this much from Wells’s estate. We also bear in mind that the expert did not see the car before work began; Harper described it as very deteriorated, with little more than the frame being sound. The extra effort that was obviously required will justify some *900 increase in the labor cost, though not nearly as much as Harper claims.
Harper admitted receiving $11,000 from Wells before his death and owing Wells $1,922.22 in unpaid legal fees. The total of $12,922.22 is reasonably near the fair value of Harper’s labor and expense; we consider that the payments and unpaid fees evenly offset the parties’ mutual obligations. La. C.C. art. 1893. The parties’ mutual obligations have been extinguished by operation of law.
For these reasons the trial court’s judgment is reversed. Judgment is rendered dismissing the parties’ respective claims. Costs are assessed to the appellant, Ed C. Harper.
REVERSED AND RENDERED; CASE DISMISSED.